JAMES S. BURLING, Alaska Bar No. 8411102
Email: JBurling@pacificlegal.org
DAMIEN M. SCHIFF,* Cal. Bar No. 235101
Email: DSchiff@pacificlegal.org
MICHAEL A. POON,* Cal. Bar No. 320156
Email: MPoon@pacificlegal.org
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111

OLIVER J. DUNFORD,* Fla. Bar No. 1017791
Email: ODunford@pacificlegal.org
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, Florida 33410
Telephone: (561) 691-5000

*Pro Hac Vice Pending
Attorneys for Petitioners and Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| WES HUMBYRD; ROBERT WOLFE; and DAN ANDERSON,<br>           Petitioners and Plaintiffs,<br><br>    v.<br><br> GINA RAIMONDO, in her official capacity as Secretary of the U.S. Department of Commerce; JANET COIT, in her official capacity as Assistant Administrator for the National Marine Fisheries Service; and NATIONAL MARINE FISHERIES SERVICE,<br>         Respondents and Defendants. | No. 3:21-cv-00247-JWS |

**PETITION FOR REVIEW & COMPLAINT**
**(16 U.S.C. § 1855; 5 U.S.C. § 706)**

## INTRODUCTION

1.      "Since time immemorial Alaska has been blessed with a natural food resource in the form of annual migrations of salmon." *Metlakatla Indian Cmty., Annette Island Rsrv. v. Egan*, 362 P.2d 901, 903 (Alaska 1961), *judgment aff'd in part sub nom.*, *Organized Village of Kake v. Egan*, 369 U.S. 60 (1962), *and vacated in part on other grounds*, 369 U.S. 45 (1962). This gift of nature "has always been one of the basic food resources of the people as well as the basis of their main industry," forming "the principal source of income for a large portion of Alaska's labor force." *Id.*

2.      Wes Humbyrd, Robert Wolfe, and Dan Anderson ("Petitioners" or "Plaintiffs") are fishermen who make their livelihoods engaging in this integral part of Alaskan identity. For decades, Wes, Bob, and Dan have fished for salmon in Cook Inlet, investing their lives in a craft that feeds their communities, their families, and themselves.

3.      In December, this time-honored way of life will be permanently wiped out from Cook Inlet.

4.      The cause is a rule approved by Defendant National Marine Fisheries Service ("NMFS" or "Service") through power delegated by Defendant Gina Raimondo, the Secretary of Commerce. *See Fisheries of the Exclusive Economic Zone Off Alaska; Cook Inlet Salmon; Amendment 14*, 86 Fed. Reg. 60,568 (Nov. 3, 2021) ("Rule"). In less than a month, the Rule will permanently close the commercial salmon fishery in Cook Inlet's federal waters—not because the fishery is overfished or for any

other conservation or environmental reason, but simply because the government finds it too bothersome to coordinate with the State of Alaska in managing the fishery.

5.     This casually destructive rule must be vacated, however, because it violates the Constitution's Appointments Clause and Take Care Clause. These "essential" structural provisions of the Constitution are accountability-preserving mechanisms. *Collins v. Yellen*, 141 S. Ct. 1761, 1783 (2021). Their basic function is to ensure presidential control over the agents who exercise executive power on his behalf.

6.     The Appointments Clause reserves the exercise of significant federal power, including rulemaking and policymaking power, to "Officers of the United States." *Buckley v. Valeo*, 424 U.S. 1, 140–41 (1976) (per curiam). Such officers must be appointed by the President with the advice and consent of the Senate, except that Congress may by law vest the appointment of "inferior" officers in the President alone, the courts of law, or the heads of departments. U.S. Const. art. II, § 2, cl. 2. These limitations make the President responsible for the selection and oversight of executive officials with significant power; and the American people can then hold him responsible for poor appointments.

7.     Though the Rule here was approved for publication by the National Marine Fisheries Service, the policy choice behind the Rule was made by the North Pacific Fishery Management Council ("Council"). The Council is an independent policymaking body created by the Magnuson-Stevens Fishery Conservation and Management Act ("Act" or "Fishery Act") to manage fisheries off the coast of Alaska.

Pursuant to the Act, the Council issues fishery management plans ("FMPs"), amendments to those plans, and implementing regulations. The Rule implements Amendment 14, an amendment to the Salmon FMP, which regulates salmon fishing in federal waters off the coast of Alaska. Under the Act, when the Council proposes a regulation, the Service must issue it as a final rule, provided only that the regulation is consistent with the Act and other applicable law. The Council thus decides the essential policy questions governing fishery management. Accordingly, Council members wield power reserved for officers.

8.      Furthermore, the breadth of their policymaking power, combined with their statutorily granted discretion and independence, means that Council members must be appointed as non-inferior officers, sometimes called principal officers. Yet, none of the Council's members who adopted the Rule was appointed by the President with the advice and consent of the Senate. Moreover, even if inferior officers could wield the Council's power, the Council members were not properly appointed as inferior officers. Accordingly, the Constitution forbade them from proposing the Rule, and the Rule is void.

9.      The Take Care Clause subjects federal officials exercising officer powers to another accountability mechanism. The Take Care Clause, with the Executive Vesting Clause, requires that officers be removable by the President, so that he is able to take care that the laws be faithfully executed. This powerful mechanism for oversight persists even if the President has other means of controlling an officer.

Given the breadth of the President's supervisory powers and responsibilities, only limited removal protections are permissible.

10. First, only two types of officers may have tenure protection: "multimember bod[ies] of experts, balanced along partisan lines, that perform[] legislative and judicial functions and [are] said not to exercise any executive power," and "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2199–2200 (2020). For reasons explained herein, the Council is neither and may not receive tenure protection.

11. Second, any tenure protection must not be so stringent as to impede the President's supervision. Yet, 10 of the 11 members of the Pacific Council enjoy such strong tenure protection that they cannot be effectively overseen. Seven members cannot be removed unless a Council supermajority consents or if the members violate certain financial conflict-of-interest provisions. Some members cannot be removed at all. These protections, by stymieing the President's efforts to oversee the members' duties, violate the Take Care Clause. And because the Rule was effected by Council members wielding officer power outside of presidential oversight, the Rule is void.

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); *id*. § 2201 (authorizing declaratory relief); *id*. § 2202 (authorizing injunctive relief); 16 U.S.C. § 1855(f) (providing for judicial review of Fishery Act regulations); *id*. § 1861 (providing district court jurisdiction over cases

arising under the Fishery Act); and 5 U.S.C. §§ 701–06 (judicial review provisions of the Administrative Procedure Act).

13.     Venue in the District of Alaska is proper because the offices of the Defendants are located within the district, a substantial part of the acts or omissions giving rise to this action occurred within the district, and Plaintiffs reside in the district. 28 U.S.C. § 1391(e).

## PARTIES

### *Plaintiffs*

14.     Wes Humbyrd, Bob Wolfe, and Dan Anderson are Alaska residents and active commercial salmon fishermen, possessing the necessary state permits.

15.     Other than a 5-year break, Wes has been fishing for salmon in Cook Inlet for approximately 53 years. He typically earns between 70% and 80% of his income fishing for salmon in Cook Inlet, predominantly in federal waters.

16.     Bob has worked in the Cook Inlet commercial salmon industry for 42 years, starting as a fish processor in 1980 and working his way up to owning his own boat and permit in 1987. Seven years ago, he started a retail business to sell his fish directly to consumers. On average, he earns 50% of his income fishing in Cook Inlet for salmon, predominantly in federal waters.

17.     Dan first started participating in Cook Inlet's commercial salmon fishery in 1986 as a deckhand. In 1989, he struck out on his own with a newly purchased vessel and permit. Due to market uncertainties, Dan did not fish for salmon in 2020, but in most years, he fishes for salmon in Cook Inlet's federal and

state waters from June to August. Fishing Cook Inlet's federal waters is typically responsible for a significant portion of Dan's annual income.

18.     Shutting down the federal waters to commercial salmon fishing will have a devastating impact on Wes, Bob, and Dan. With the waters in the middle of Cook Inlet closed, Plaintiffs will be forced to fish in nearshore state waters. Salmon in nearshore waters are not spread out evenly but rather congregate near the river mouths into which they migrate. Plaintiffs will therefore be required to drive their vessels an additional 8 to 10 hours per trip to arrive at a viable fishing site. If tides are unfavorable, Plaintiffs may be required to drive to state waters the day before they fish. This will injure Plaintiffs not just by increasing their operating costs, but also by imposing additional travel time, decreasing fishing opportunities, and significantly reducing their catch.

19.     The Rule is also expected to impact the quality of Plaintiffs' catch. In Plaintiffs' experience, salmon in the open federal waters are fattier and of higher quality in texture, firmness, and color compared to nearshore salmon that have begun to migrate upriver. Their catch in state waters is therefore expected to be less competitive and sell at a lower price at market.

20.     The volume of their catch will also be significantly curtailed. State waters extend only three nautical miles from shore, and much of that space is already taken up by other fishermen. For example, setnetters may place their nets up to 1.5 nautical miles from shore, depending on the precise location. Plaintiffs will thus be

left to fish in an extremely narrow band of water, significantly limiting the volume of possible catch compared with fishing in the open federal waters.

21. To catch salmon, Plaintiffs rely on drift gillnets, an efficient and economical method of fishing. But the difficulties and dangers of drift gillnet fishing in state waters will be greater than in open federal waters. Successful drift gillnet fishing requires significant space in which to spread out the gillnet. As a result, crowding the entire commercial salmon fishing fleet into the narrow band of state waters will require Plaintiffs to constantly maneuver their vessels and gear to avoid sand bars, rocks, and collisions and interference with other fishermen. These hazards of confining Plaintiffs to state waters—made worse by Cook Inlet's large tidal fluctuations—will increase the chances that Plaintiffs suffer damage to their fishing gear and vessels.

22. Because of these factors, Wes, Bob, and Dan expect the fishery closure under the Rule to put them out of business, ending their decades-long careers fishing for salmon and significantly decreasing their incomes.

23. Even then, the Rule inflicts a further economic injury on each Plaintiff by reducing the value of his fishing assets, including his transferable fishing permits, vessels, and gear.

## *Defendants*

24. Gina Raimondo is the Secretary of Commerce and the official charged by law with administering the Fishery Act. She is sued in her official capacity only.

25. Janet Coit is the Assistant Administrator for Fisheries. The Assistant Administrator approved the Rule as being consistent with applicable law. She is sued in her official capacity only.

26. The National Marine Fisheries Service is an agency within the Department of Commerce. The Secretary of Commerce has delegated to the National Oceanic and Atmospheric Administration ("NOAA") the authority to administer the relevant portions of the Fishery Act; and NOAA has sub-delegated that authority to the Service.

## LEGAL BACKGROUND

### *Federal Fisheries Management*

27. In the United States, the state and federal governments divide authority to regulate oceanic fisheries. States govern nearshore waters, from the shoreline to three nautical miles offshore, while federal authority extends from three nautical miles to 200 nautical miles offshore. *United Cook Inlet Drift Ass'n v. NMFS*, 837 F.3d 1055, 1058 (9th Cir. 2016).

28. Federal fisheries are regulated through the process established by the Magnuson-Stevens Fisheries Conservation and Management Act. The express purpose of the Act is to manage fisheries to maximize their long-term benefits, including for commercial fishermen; the Act is not a one-sided environmentalist measure. 16 U.S.C. §§ 1801, 1851.

29.     This purpose is given force through fishery management plans and amendments usually developed by eight regional fishery management councils and approved by the Secretary. *See id.* §§ 1852, 1854(a).

30.     The fishery management plans and amendments are, in turn, implemented through regulations usually proposed by the regional councils and approved by the Secretary. *Id.* §§ 1853(c), 1854(b).

31.     The Secretary has delegated her powers under the Fishery Act, including approval of fishery management plans, amendments, and regulations, to the Service.

32.     The Secretary, and so the Service, may not reject councils' fishery management plans, amendments, and implementing regulations unless the same would violate "applicable law." *See id.* § 1854(a)(3), (b)(1). The Fishery Act does not authorize the Service or the Secretary to reject councils' fishery management plans, amendments, or implementing regulations for any other reason, such as a preference for a different policy approach. *See id.*

33.     The Service is led by the Assistant Administrator for Fisheries. The Assistant Administrator for Fisheries is not nominated by the President and confirmed by the Senate.

### The Regional Fishery Management Councils

34.     Among the eight fishery management councils established by the Fishery Act is the North Pacific Fishery Management Council, which covers the states of Alaska, Washington, and Oregon. *Id.* § 1852(a)(1)(G).

35.     The Council is an independent entity within the Executive Branch not contained within any other agency or Executive Department.

36.     The Council has 11 voting members. *Id.*

37.     A quorum is a majority of the Council, and the Council acts by majority vote of those present and voting. *Id.* § 1852(e)(1).

38.     **The Regional Administrator:** One voting member of the Council is "[t]he regional director of the National Marine Fisheries Service for the geographic area concerned, or his designee." *Id.* § 1852(b)(1)(B). The relevant official here is the NMFS Alaska Regional Administrator.

39.     The Alaska Regional Administrator is appointed by the NMFS Deputy Assistant Administrator for Regulatory Programs.

40.     The Alaska Regional Administrator is a career official in the Senior Executive Service. He is therefore removable only for cause. 5 U.S.C. §§ 7541–43.

41.     **The state officials:** Three voting members consist of the "principal State official with marine fishery management responsibility and expertise in each constituent State, who is designated as such by the Governor of the State, so long as the official continues to hold such position, or the designee of such official." 16 U.S.C. § 1852(b)(1)(A).

42.     The relevant Alaska state official is the Commissioner of the Alaska Department of Fish and Game. The Commissioner is appointed to his state position by the governor of Alaska.

43. The relevant Washington state official is the Director of the Washington Department of Fish and Wildlife. The Director is appointed to his state position by the Washington Fish and Wildlife Commission.

44. The relevant Oregon state official is the Director of the Oregon Department of Fish and Wildlife. The Director is appointed to his state position by the Oregon Fish and Wildlife Commission.

45. The Act does not permit the President or the Secretary to remove the three state fishery officials from the Council.

46. **The governor-nominated members:** The remaining seven voting members are appointed by the Secretary, *id.* § 1852(a)(1)(G), but the Secretary's selection is limited to a list of nominees provided by the governors of Alaska and Washington, *id.* § 1852(b)(2)(C). The Alaskan governor provides nominations for five of the positions and the Washington governor for two positions. The governors need provide no more than three nominees for each vacancy.

47. The Secretary may reject a slate of nominees for a position only if the nominees fail to satisfy certain minimal statutory qualifications, in which case the governor may revise the list or resubmit the original list with additional explanations of the individuals' qualifications; the Secretary may not reject the list on the basis of the nominees' judgment, policy prescriptions, or character. *Id.*

48. The Secretary does not herself appoint these Council members. As with her other powers under the Fishery Act, the Secretary has delegated her appointment power to the NOAA Administrator. The NOAA Administrator has, in turn, delegated

this appointment power to the Assistant Administrator for Fisheries, who leads NMFS. The Assistant Administrator appoints these seven Council members.

49.    The Act permits the Secretary to remove a governor-nominated member only if the Council first recommends removal by a two-thirds majority of voting members and states the basis for the recommendation, or the member violates § 1857(1)(O), a financial conflict-of-interest provision. *Id.* § 1852(b)(6).

### *The Appointments Clause*

50.    The Appointments Clause of the United States Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. This requirement applies to both principal (also called superior) officers and inferior officers, except that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

51.    "[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by" the Appointments Clause. *Buckley*, 424 U.S. at 126.

52.    The Appointments Clause is not limited to officials with authority to "enter a final decision" on behalf of the United States; it applies to any official who "exercise[s] significant discretion" in "carrying out . . . important functions." *Freytag v. Comm'r*, 501 U.S. 868, 881–82 (1991).

53.     Rulemaking is significant authority which may be exercised only by an officer. *Buckley*, 424 U.S. at 140–41.

54.     A person exercising officer powers may be appointed as an inferior officer only if his "work is directed and supervised at some level by others who were appointed by presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663 (1997). It is necessary but "not enough that other officers may be identified who formally maintain a higher rank, or possess responsibilities of a greater magnitude." *Id.* at 662–63. The key question, rather, is "how much power an officer exercises free from control by a superior." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1982 (2021).

55.     Three factors that bear on whether an official wielding officer powers may be appointed as an inferior officer are: (1) whether the officer is subject to oversight in the conduct of his duties; (2) whether the officer is subject to removal without cause; and (3) whether the officer has "no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Edmond*, 520 U.S. at 664–65. Supervision over inferior officers must extend to "matters of law as well as policy." *Arthrex*, 141 S. Ct. at 1983; *see Collins v. Yellen*, 141 S. Ct. 1761, 1783 (2021). A head of department may not be appointed as an inferior officer. *Freytag v. Comm'r*, 501 U.S. 868, 884 (1991) (identifying heads of departments as "principal federal officers" who must be appointed with Senate confirmation).

56.     The practical result of the Appointments Clause is that officers with more discretion must be appointed by nomination and confirmation, while closely supervised officers with less discretion may be appointed with less scrutiny (if allowed by Congress). Only nonofficers—those who lack any significant federal authority—may be selected by other means.

## The Take Care Clause

57.     The Take Care Clause, together with the Executive Vesting Clause, empowers the President to remove officers. *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 484, 492 (2010); *Seila Law*, 140 S. Ct. at 2205. The removal power ensures that officers, once appointed, remain under the President's control so that he may ensure and be accountable for the faithful execution of the laws. This power persists even if the President can control an officer through other means, such as the budget process and regulations. *Free Enter. Fund*, 561 U.S. at 504.

58.     Congress may bestow tenure protection only on two small categories of officers: "multimember bod[ies] of experts, balanced along partisan lines, that perform legislative and judicial functions and [are] said not to exercise any executive power," and "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2199–2200.

59.     Even among officers who may enjoy tenure protection, the protection must be "[]appropriate for officers wielding the executive power of the United States." *Free Enter. Fund*, 561 U.S. at 503. Thus, Congress "may not eliminate the President's

removal power altogether" for any officer. *Seila Law*, 140 S. Ct. at 2205. And Congress may not create more than one level of tenure protection—that is, grant tenure protection to an officer who may be removed only by another officer with tenure protection. *Free Enter. Fund*, 561 U.S. at 493. No tenure protection may be so stringent as to "impede the President's ability to perform his constitutional duty." *Seila Law*, 140 S. Ct. at 2199 (alteration omitted) (quoting *Morrison v. Olson*, 487 U.S. 654, 691 (1988)).

## FACTUAL ALLEGATIONS

### *The Cook Inlet Salmon Fishery*

60.     Plaintiffs make their living fishing for salmon in the federal waters of Alaska's Cook Inlet. Cook Inlet is a large inlet connecting the Pacific Ocean to major Alaskan rivers. Because of its width, Cook Inlet has both state and federal waters.

61.     Cook Inlet's federal waters fall under the authority of the North Pacific Fishery Management Council but, until now, no fishery management plan governed those waters. Rather, the Council left management of these waters to Alaska.

62.     In 2016, the Ninth Circuit held that this arrangement violated the Act and required the Council to manage Cook Inlet's federal waters through an FMP. *United Cook Inlet Drift Ass'n*, 837 F.3d 1055.

63.     In response to the Ninth Circuit's decision, the Council proposed to amend a preexisting FMP bordering Cook Inlet. The amendment—Amendment 14—and the Rule, which implements Amendment 14, expand that preexisting FMP to include the Cook Inlet federal waters.

64.     In addition, Amendment 14 and the Rule ban commercial salmon fishing in Cook Inlet's federal waters. Although the Council had considered keeping the fishery open and simply managing it in accordance with the Fishery Act, it ultimately opted to close the fishery instead.

65.     NMFS determined that the Rule was consistent with applicable law and published it for comment. On November 3, 2021, NMFS published the Rule as a final rule.

## DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS

66.     Each of the Plaintiffs has a significant interest in whether the Rule was lawfully promulgated. A substantial portion of each Plaintiff's income depends on commercial salmon fishing in Cook Inlet's federal waters. Further, Plaintiffs' fishing permits, vessels, and gear comprise a significant portion of Plaintiffs' assets. The closure of the Cook Inlet federal waters to commercial salmon fishing will visit significant economic hardship on Plaintiffs, in addition to reducing the value of their permits, vessels, and gear. A decision declaring the Rule to be inconsistent with the Appointments Clause or the Take Care Clause would remedy these injuries by preserving the value of Plaintiffs' assets and enabling Plaintiffs to continue to their fishing businesses.

67.     Plaintiffs have no plain, speedy, and adequate remedy at law for their injuries. Money damages in this case are not available.

68.     This case is currently justiciable because the Rule permanently closes the salmon fishery in Cook Inlet to commercial fishing, starting on December 3, 2021.

69. Therefore, declaratory and injunctive relief are appropriate to resolve this controversy.

## FIRST CLAIM FOR RELIEF

### *Exercise of Powers Reserved to Officers of the United States by Persons Not Appointed Consistent with the Appointments Clause*
### **(U.S. Const. art. II, § 2, cl. 2; 5 U.S.C. § 706(2)(B))**

70. The preceding paragraphs are incorporated herein by reference.

71. Council members wield power reserved for officers of the United States because they exercise significant powers pursuant to the laws of the United States, including rulemaking powers.

72. Although Council members cannot promulgate regulations on their own, proposed Council regulations may be blocked only for inconsistency with law, not policy. *See* 16 U.S.C. § 1854(b). Thus, the Council and its members are endowed with significant power to make federal fishery policy.

### *Unlawful Principal Officers*

73. Council members must be appointed as principal officers because they are not effectively supervised by anyone who is appointed by the President with the advice and consent of the Senate. Council members are not removable at will but rather enjoy extraordinarily strong protections against removal. *See id.* § 1852(b)(6). They have wide discretion over policy decisions. *See id.* § 1854(a)(3), (b). And they operate largely independent of external direction: they set their own priorities, establish and direct their own staff, and create their own operating procedures. *Id.* § 1852(e), (g)–(i).

74. Council members must also be appointed as principal officers for an independent reason. Because the Council is a freestanding entity within the Executive Branch, it constitutes an Executive department for constitutional purposes, and the Council members collectively constitute a head of a department. *Free Enter. Fund*, 561 U.S. at 511. Heads of departments, by definition, must be appointed as principal officers. *Freytag*, 501 U.S. at 884.

75. Despite the requirement that they be appointed as principal officers, Council members are not appointed through presidential nomination and Senate confirmation. They therefore exercise their powers unconstitutionally.

*Unlawful Inferior Officers—Appointment by Constitutionally Ineligible Persons*

76. Even if Council members need only be appointed as inferior officers, such appointment has not taken place, and they therefore exercise their powers unconstitutionally.

77. The default appointment procedure for inferior officers is presidential appointment with Senate confirmation. *Edmond*, 520 U.S. at 660.

78. The Constitution permits Congress to loosen this requirement within strict limits: Congress may only vest the appointment of inferior officers in the President, the courts of law, or the heads of departments; and Congress must do so "by law." U.S. Const. art. II, § 2, cl. 2.

79. Here, one Council seat is taken by the Service's Alaska Regional Administrator, *see* 16 U.S.C. § 1852(b)(1)(B), whose appointment Congress has not vested by law in the President, the courts of law, or a head of department, *see*

*generally id.* § 1851, *et seq.*, and is appointed by the Service's Deputy Assistant Administrator for Regulatory Programs. This seat is therefore unconstitutionally filled.

80.     Three seats on the Council are filled by state officials pursuant to three governors' designations. But the appointment diffusion for these seats goes even further, because the governors are not solely responsible for these officials' appointments to their *state* positions.

81.     Each governor designates as a Council member the "principal State official with marine fishery management responsibility and expertise" in his respective state. *Id.* § 1852(b)(1)(A). They thus sit on the Council by virtue of their state positions. And the relevant state officials for Washington and Oregon—the Washington Director of Fish and Wildlife and the Oregon Director of Fish and Wildlife—are appointed to their state positions by the Washington Fish and Wildlife Commission and Oregon Fish and Wildlife Commission, respectively. These commissions are therefore directly responsible for the placement of two individuals onto the Council.

82.     Even more egregiously, the state officials themselves do not sit on the Council. At the time the Council approved Amendment 14 and the Rule, each state official had appointed a designee to sit on the Council. *Cf. id.* § 1852(b)(1)(A) (allowing either the state official with principal fishery responsibilities "or the designee of such official" to sit on the Council).

83. The actual Council members were thus appointed by the principal state official in charge of fisheries. Those state officials were designated by the governor and appointed by state commissions (in Washington and Oregon) or the governor (in Alaska).

84. Needless to say, none of these three Council positions is filled by the President, the courts of law, or a head of department. *See id*. § 1852(b)(1)(A). They are therefore unconstitutionally filled.

*Unlawful Inferior Officers—Unconstitutional*

*Restraint on Appointing Officer's Power*

85. Statutorily, the remaining seven Council seats are filled by the Secretary from lists provided by the governors of Alaska and Washington. 16 U.S.C. § 1852(b)(1)(C), (b)(2)(C). The Secretary may reject a governor-prepared list only if it fails to meet objective statutory criteria, not for policy or character reasons. *See id*. § 1852(b)(2)(C). Because the governors may designate as few as three individuals per obligatory vacancy and 12 individuals per at-large vacancy, they can effectively force the Secretary to appoint individuals whose judgment and character she mistrusts and whose policy prescriptions she disagrees with.

86. This arrangement unconstitutionally constrains the appointment power. *See Myers v. United States*, 272 U.S. 52, 128 (1926) (holding that statutory limitations on an appointment power cannot "so limit selection and so trench upon executive choice as to be in effect legislative designation"); *United States v. Espy*, 145

F.3d 1369, 1372 (D.C. Cir. 1998) (quoting *Myers* and acknowledging that Congress faces "constitutional limits" in restricting executive appointments).

*Unlawful Inferior Officers—Appointment by Assistant Administrator*

87.     Even if the division of the appointment power established by the Fishery Act were permissible, the seven seats reserved for Secretarial appointment would still be unconstitutionally filled because the Secretary has not actually made those appointments. Rather, the Assistant Administrator for Fisheries—who is not the President, a court of law, or a head of department—has been delegated the responsibility for these appointments from the Secretary and the NOAA Administrator. National Oceanic & Atmospheric Administration, U.S. Department of Commerce, NOAA Organizational Handbook: Transmittal No. 61, at PDF 2–3 (2015), https://bit.ly/3k9XRlj.

88.     For this independent reason, the seven seats are unconstitutionally filled.

89.     Because the Rule was proposed by the Council, and its members are unconstitutionally appointed, the Rule is contrary to constitutional right, power, privilege, or immunity. 5 U.S.C. § 706(2)(B).

*In the Alternative—Unconstitutional Action by the Assistant Administrator*

90.     The Fishery Act unambiguously requires the Secretary to publish any regulation that is proposed by a Council and is consistent with law. 16 U.S.C. § 1854(b). The entire policymaking decision therefore lies with the Council. But even assuming that the Service possesses substantive policymaking discretion over such

regulations, the Rule was nevertheless issued in violation of the Appointments Clause.

91.     The Assistant Administrator for Fisheries has been delegated wide, unreviewable discretion to exercise the Secretary's powers. She therefore must be appointed as a principal officer. Nevertheless, she is not nominated by the President and confirmed by the Senate. Any policymaking discretion on her part was therefore exercised in contravention of the Appointments Clause.

92.     Even if the Assistant Administrator need only be appointed as an inferior officer, Congress has not provided "by law" that she may be appointed by the President alone, a court of law, or a head of department. She therefore must be appointed by the default procedures for inferior officers: presidential nomination and Senate confirmation. Because she was not so appointed, her actions, including any policymaking power she exercised with respect to the Rule, violate the Appointments Clause.

93.     The Rule is thus contrary to constitutional right, power, privilege, or immunity. 5 U.S.C. § 706(2)(B).

## SECOND CLAIM FOR RELIEF

### *Exercise of Powers Reserved to Officers of the United States by Persons Not Properly Removable Pursuant to the Take Care Clause and the Executive Vesting Clause*
**(U.S. Const. art. II, § 3, cl. 5; U.S. Const. art. II, § 1, cl. 1; 5 U.S.C. § 706(2)(B))**

94.     The preceding paragraphs are incorporated herein by reference.

95.     For reasons discussed in the First Claim for Relief, Council members are officers of the United States.

96. The Take Care Clause, together with the Executive Vesting Clause, requires that officers be removable by the President, so that he may oversee and thereby take responsibility for their actions.

97. Only certain types of officers may enjoy tenure protection. But the Council is neither a "multimember body of experts, balanced along partisan lines, that perform legislative and judicial functions and is said not to exercise any executive power," nor does it comprise "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2199–2200. Thus, no Council member may have any sort of tenure protection; each must be removable at will. Their tenure protections therefore violate the Take Care Clause.

98. Even if Council members were permitted to enjoy tenure protections, the tenure protections here are so stringent as to impede the President's oversight and so violate the Take Care Clause and Executive Vesting Clause.

99. The three state officials are not removable at all by the President or another officer of the United States, which arrangement violates the Take Care Clause and Executive Vesting Clause.

100. The seven Council members nominated by the governors may be removed by the Secretary only if two-thirds of the Council agrees, or if these members violate certain financial conflict-of-interest provisions. 16 U.S.C. § 1852(b)(6)(A)–(B).

101. The former method creates more than one layer of tenure protection, because to remove a Council member, the Secretary must first gain the assent of other Council members, who are similarly protected. In fact, this removal method creates

interminable layers of tenure protection because the protection is recursive: to remove a Council member, the Secretary must gain the assent of other Council members, none of whom can be removed without the assent of other Council members, none of whom can be removed without the assent of other Council members, and so forth. The result is that just over one-third of the Council, if united, can frustrate all attempts of removal under this pathway. This level of protection prevents the President from holding the Council to account and therefore does not satisfy the Take Care Clause and Executive Vesting Clause.

102.    The latter method is not a removal provision that permits the President to take care that the laws be faithfully executed, because it is not substantially related to the performance of Council members' duties. Removal provisions do not satisfy the Take Care Clause and Executive Vesting Clause simply by technically permitting removal in narrow circumstances. *See Free Enter. Fund*, 561 U.S. at 503 (noting that some removal standards may "be inappropriate for officers wielding the executive power of the United States").

> The President must be able to remove . . . officers who disobey his commands [and] also those he finds negligent and inefficient, those who exercise their discretion in a way that is not intelligent or wise, those who have different views of policy, those who come from a competing political party who is dead set against the President's agenda, and those in whom he has simply lost confidence.

*Collins*, 141 S. Ct. at 1787 (cleaned up).

103.    Yet, the second removal method would not permit removal even of a member who flagrantly abuses his power, engages in nepotism, or engages in criminal malfeasance while in office, so long as he scrupulously divulges his financial interests

and recuses himself from appropriate Council decisions. For example, so long as members avoid financial conflicts of interests, they may openly violate every regulation-created rule that purports to govern their conduct, *see* 50 C.F.R. § 600.225 (prohibiting abusing one's office to interfere with an election, restricting lobbying activities, forbidding adverse action against Council employees based on political affiliation or activity, and prohibiting criminal and dishonest conduct), yet successfully resist removal. The second pathway to removal therefore does not satisfy the Take Care Clause and Executive Vesting Clause.

104.    For the foregoing reasons, 10 of the 11 Council members' removal protections violate the Take Care Clause and Executive Vesting Clause because the President is not capable of overseeing the Council's agenda or actions.

105.    Therefore, the Rule is contrary to constitutional right, power, privilege, or immunity. 5 U.S.C. § 706(2)(B).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for relief as follows:

1.    As to the First Claim for Relief, a judgment declaring that the Rule violates the Appointments Clause;

2.    As to the First Claim for Relief, a permanent prohibitory injunction setting aside the Rule and forbidding Defendants from enforcing it, because it violates the Appointments Clause;

3.    As to the Second Claim for Relief, a judgment declaring that the Rule violates the Take Care Clause and Executive Vesting Clause;

4.     As to the Second Claim for Relief, a permanent prohibitory injunction setting aside the Rule and forbidding Defendants from enforcing it, because it violates the Take Care Clause and Executive Vesting Clause;

5.     As to both Claims for Relief, an award of reasonable attorney fees and costs, pursuant to 28 U.S.C. § 2412, or any other applicable authority; and

6.     As to both Claims for Relief, any other relief that the Court deems just and proper.

DATED: November 9, 2021.

Respectfully submitted,

JAMES S. BURLING
DAMIEN M. SCHIFF*
MICHAEL A. POON*
OLIVER J. DUNFORD*

By     /s/ James S. Burling
        JAMES S. BURLING
        Alaska Bar No. 8411102

*Pro Hac Vice motions pending        *Attorneys for Petitioners and Plaintiffs*